Mr. Lattimore and Mr. Gavings are here for the appellants. Mr. Patterson and Mr. Shaughnessy for the appellee. And we'll start with Mr. Lattimore when you're ready. May it please the court. My name is Will Lattimore. Lloyd Gavings and I represent over 300 individuals who objected to the class action settlement below who have collectively been referred to as the Owens objectors throughout this litigation. The structural protections of Rule 23 are not there just to be a hassle or a nuisance or an impediment to settlements or a disturbance in the functions of the court or the lawyers to try class actions. They're there for a reason. They have utility. They've got a purpose. It's to protect the interests of absent class members from intentional and unintentional abuses of the class action system. The Supreme Court held in Ortiz that in the application of these structural protections, district courts need to have heightened vigilance. They need to be more vigilant in the settlement context than they are in the motion for class certification context. Because in the settlement context, there is no adversarial component to the certification. And the absent class members are more easily susceptible to abuses of the system. In this case, at least 59,000 individuals were bound to a Rule 23b2 settlement, one they have no power to opt out of. And they were represented by class counsel that was saddled with a conflict of interest in violation of 23a4. And the class counsel released too much. They released claims for individualized monetary damage in a b2 settlement, running afoul of the Supreme Court's holding in Walmart v. Dukes and this court's holding in Murray v. Auslander. Aren't those claims preserved, though? This is just a partial settlement that was approved, right? That's right. Claims for, you know, the negligence claims for mental anguish and those, aren't they still preserved? They are preserved as to a defendant that's not here, Your Honor. They are released as to Dykin, as to this one defendant. And what we've got to be careful of now, when a lawyer represents one client, and you've got a settlement with one defendant, that lawyer can make decisions about, well, I'm going to release these claims and collect on these claims in this settlement for my one client with my one defendant. Where we've got to be careful is where the lawyer has more than one client. For example, a class and these lawyers also represent a water authority. And you are releasing one client's claims in order to advance the interests of your other client. And that's the situation we've got here. This situation, as this court is likely aware, arises out of water pollution in the Tennessee River in North Alabama. Dykin manufactures polyfluoromers, including PTFE, which is a substance more commonly known as Teflon. It uses perfluoroactanoic acid, PFOA, in its manufacturing processes. And it operates its plant right there on the banks of the Tennessee River. And it discharges this PFOA into the Tennessee River. And as far as I'm aware, it continues to do so today. Now, there's another chemical at issue, perfluoroctanesulfonate, PFOS. And Dykin does not manufacture PFOS. The problem is that the property Dykin's plant sits on used to be a disposal for industrial sludge. And there's PFOS and PFOA in the property of the stormwater. What's the real concern now on the part of the Owens objectors? Because we have a determination that's made by the district court that the settlement was fair and reasonable and adequate. And we review that determination for an abuse of discretion. He says the negotiations were made at arm's length. And your clients are now getting clean water. They're getting some monetary damages. The district court says this is an arm's length negotiation and the settlement was a reasonable compromise. If we look and see that those determinations are supported in the record, if the record reflects these findings, how do we find that the district judge abused his discretion? We have to find that there's a clear error of judgment on the part of the district court. That's right. And it can be very tempting to just look at a settlement and say, well, it's fair, and to let it go at that. But what the Supreme Court has warned against in the Amchem decision, Justice Ginsburg warned against exactly that. Where the violation occurs is that there was no – the structural protections of Rule 23 were violated. It's not enough just to say it's a fair settlement. And, in fact, in the Amchem decision, Justice Ginsburg, on behalf of the court, said federal courts lack authority to substitute for Rule 23's certification criteria a standard that has never been adopted. Is it the monetary damages that the Owens objectors – is that the part of the settlement that they're really concerned about here? Because there's a new filtration system. They're getting clean water. They're getting compensated for the time that they were told not to drink the water. And so – That's right. It's the monetary damages claim, Your Honor. Is that the one that they're concerned about? That's right. The Water Authority doesn't have any interest in the class member's monetary damage claim. Okay. The Water Authority has an interest in being compensated for its water filtration system. Monetary damages for what now? For the period of time that they didn't – that they were unable to drink the water? Well, monetary damages for metal anguish. Okay. Those metal anguish claims are critical to this appeal. And those metal anguish damages are not preserved in separate litigation? They're not preserved for – No, Your Honor. They preserve damages for personal injury. And they preserved – well, and that's about it. They preserved damages related to property damage arising out of water that gets onto the property via other means, in other words, via other means than the drinking water. The metal anguish damages from this were released in this settlement against Eichen. And that is the concern. Now, in Alabama, those monetary – those metal anguish claims are very significant. The plaintiff's class members filed claims for negligence, nuisance, and battery and unwanted touching. And in Alabama, when the wrongful – when the conduct of the defendant places the plaintiff at risk of physical harm, you're entitled to damages for metal anguish. There are Alabama pattern jury instructions on that. In the summer of 2016, these individuals who received this water were told that the water was full of this PFOA or had PFOA and PFOS at unsafe levels, exposing them to risk of kidney cancer, testicular cancer, thyroid problems, and a host of other medical problems. Now, individuals who have those actual injuries, who already have cancer, their claims for their physical injuries are preserved. But as to all these other people who heard this news, that they were placed at risk of physical harm by the defendant's conduct, they've got claims for metal anguish that are significant, and they're all being released in this settlement. It's a monetary – and this court has said in Murray v. Oslander that damages for metal anguish are individualized. They are an inherently individual injury. You've got to look at that individual and say, how are you affected mentally by this? And that's going to differ a lot of times from person to person. And what the Supreme Court said in Wal-Mart v. Dukes is that individualized monetary damages claims – it said, at a minimum, individualized monetary damages claims are not appropriate for certification in the B-2 context, in other words, non-opt-out context. And the court drew the line very clearly between B-2 claims, which are not for injunctive relief, and thus are non-opt-out, and B-3 claims, which are intended to cover claims for monetary damages and have extra protections that allow individuals to opt out of the class because they are still entitled to have their day in court. If they want to pursue their monetary damages claim on their own, they get to opt out of the settlement and go forward. That's an important protection that is covered, that applies in the B-3 context and not the B-2 context. And that's why the Supreme Court in Dukes said these individualized monetary damages claims can only be certified in the B-3 context, where you've got these extra protections and you're allowed to opt out. If we find that there was a conflict, do we need to rule on any of the other issues or just send it back and say get different counsel? It would be dispositive, Your Honor. If you rule there is a conflict, and that's specifically the issue in Amchem, in Ortiz, and there's a case that's got very similar or an analogous situation. It is the NRA payment card interchange fee case. It's a Second Circuit decision where you had separate subclasses. You have one subclass that got injunctive relief under B-2 and a separate class that got monetary damages relief under B-3. Those two classes were represented by the same counsel. And what the Second Circuit, applying Amchem and Ortiz, said was some of these, the monetary damages class seeks a form of relief that's different from the B-2 injunctive relief class. They've got interests that tug against each other, and as such there has to be separate counsel, and they reversed on that basis.  How would we say that there's a conflict of interest if the Alabama Rule of Professional Responsibility Rule regarding conflicts of interest doesn't apply to class action settlements? Well, because outside of the Alabama Rules of Professional Conduct, well, the Alabama Rules of Professional Conduct apply because there are 400 individual class members who actually sued the water authority. Keep in mind that the way this polluted water got to the class members is because up until very recently, the water authority failed to filter out the chemicals from this water before pumping it into over 25,000 individuals' homes. And at least 400 class members have actually sued the water authority. So you've got a conflict there that implicates the Alabama Rules of Professional Conduct. Now, in addition to that, you've got Amchem, Ortiz, and NRA Payment Card Interchange, which do not apply rules of professional conduct. They apply in class actions under 23A4. And that's the situation we've got here. So if this court says, all right, the Alabama Rules of Professional Conduct don't implicate any wrongdoing here, you've still got Amchem and Ortiz and Rule 23A4 that separated out. I think the monetary damages aspect of this, that that's being released in a B-2, that is just as conclusive. That is just as strong of a reason to reverse. And we'll reserve the rest of our time. Thank you. Thank you. Mr. Patterson? May it please the Court, I'm Lee Patterson, counsel for the APELE members of the class, as well as the West Morgan-East Lawrence Water Authority, which we call the WNEL. I think you've probably seen that abbreviation in the briefs. I plan to address the conflict issues raised by Mr. Lattimore. Bob Shaughnessy represents Dyking. He will address the other issues if that is okay with the court. The district court did not abuse its discretion in finding there was no conflict of interest. Not only was there no conflict of interest generally, but as it relates to this settlement, this injunctive relief class settlement, which is what this court should focus on, the district court found no conflict of interest at all. The district court found there was an absolute unanimity of interest between the WNEL and the members of the class with respect to the injunctive relief to be provided by this settlement. Clean, safe water at no cost to the class. By statute, under Alabama law, the WNEL is obligated, they are charged and obligated with passing on, in the form of rates or rate increases, costs necessary to do things like the installation of the granular activated carbon filtration system. Both principle and interest on the bond that the WNEL had to take out to fund that project, all of that gets passed on to the class. The conflict argument raised by the objectors is based on a fundamental misunderstanding of what this settlement does and does not provide. It's purely injunctive relief. In no way is the WNEL made whole, as they've argued. In no way are the interests of the class members in any way subordinated. At the end of the day, the WNEL did go and secure bonds to fund the construction, the engineering, the installation of the granular activated carbon filtration system, but those costs are going to be passed on to the class members. I want to respond to the arguments and some of the cases that they raised. Amchem and Ortiz, not applicable to this class settlement at all. Amchem and Ortiz were global asbestos personal injury class settlements in which claims for individuals with present manifest personal injury were being released in addition to claims of individuals who may have an injury in the future. This settlement in no way releases any personal injury claims at all. All of those are preserved. They're preserved against Dykin. They're preserved against 3M. With respect to mental anguish claims. With respect to mental anguish, under Alabama law, it is the Southern Bakeries case. Under Alabama law, there is no right to recover for fear of a future injury. That case involved a situation where a couple individuals were removing an oven and they were told this oven has no asbestos associated with it. The individuals removed the oven, found out later it's full of asbestos and bad asbestos. Is that what their mental anguish claim is all about, fear of a future injury? I thought they were asking for damages for prior injury, the mental anguish that took place as a result of knowing that they were drinking this contaminated water. That claim is made in the complaint, Your Honor, but under Alabama. That claim is what? A claim is asserted for battery. And is it gone now? The battery claim has survived, but as part of any give and take in a settlement negotiation, there are certain claims. For example, Daikin, a 5% contributor to only one of the chemicals at issue in this case, willing to fund the injunctive relief necessary to pay for the filtration system. So part of the give and take in that negotiation was releasing Daikin for that aspect of an emotional distress claim. But to the extent any class member has a manifest personal injury, present manifest injury, those emotional distress, mental anguish claims survive for that individual. They are excluded from this settlement. I would point the court also to the holding in in-ray corrugated antitrust litigation. It's a case that Daikin cited in the brief, 5th Circuit, 1981. An argument was raised there that class counsel had an impermissible conflict of interest because there were, I think, 26 defendants that had been named in litigation had to do with pricing of corrugated materials. Early in that litigation, settlements were reached with a couple of the defendants, and an argument was made by objectors that those settlements disproportionately favored some class members as opposed to others. And in that case, the 5th Circuit said even assuming there could potentially be a hypothetical conflict of interest sometime in the future, what we have to focus on here is the terms of the settlement. And that's what the district court did correctly, and that's what this court should do. And there is no conflict of interest as it relates to this particular partial settlement, as you recognize. This litigation continues against 3M. I would point out since May of 2017, we have gathered almost 30 million pages of documents related to the ongoing litigation against 3M. We've conducted four sampling events along the Tennessee River with experts. We've taken two trips to Minneapolis, Minnesota to take depositions of 3M current and former employees and also taken depositions in Decatur. So in no way has the WMEL been made whole. There's no way this litigation at all ended. It continues with all claims and all aspects of relief available to the class against the remaining defendant. Thank you. Thank you, Mr. Patterson. Mr. Shaughnessy. Good morning. Robert Shaughnessy for Defendant Applee, Daikin America, Inc. May it please the Court, the settlement between the class and Daikin in this case ensures that class members receive clean water. Judge Kalan did not abuse his discretion in certifying the settlement class under Rule 23b-2 or in approving the settlement under Rule 23e. Rule 23b-2 imposes two and only two requirements, and it's undisputed that they were met here. Daikin acted with respect to the class on grounds common to all class members by putting the chemicals into the water, and final injunctive relief is appropriate with respect to the entire class. There's no dispute that Daikin's agreement to fund the filtration system at the West Morgan plant is in substance injunctive relief. The objectors agreed with that. Judge Kalan agreed with that. And significantly, that injunctive relief is indivisible and nondisclaimable by class members. No class member can opt out of receiving clean water. And that is the basic rationale for why B-2 class actions do not carry opt-out rights. It's fundamentally unfair for class members to accept the benefits of the class settlement and at the same time continue to fight for additional remedies from the defendant through continued litigation. Once we've established that those two elements of B-2 were met, as they are here, that is the end of the B-2 inquiry. Of course, the objectors claim that the B-2 certification was improper here because the class settlement released the alleged monetary claims for mental anguish. To be clear, those claims were released, but they were not certified. We cited in our brief in the recent 28J letter a long line of cases continuing up to the present in which courts recognize that claims can be released that were not certified, were not even contained in the complaint, and indeed could not have been contained in the complaint for lack of jurisdiction. In those cases that you're citing, did they all have the same attorney? Yes. I mean, those are not conflict-relevant cases. But, yes, the class was represented by a single attorney. The part of Rule 23 that governs analysis of whether the release was proper in scope is not Rule 23B-2, it's Rule 23E, which provides a range of protections for class members in the settlement context that do not exist in the class litigation context. The right to notice, the right to object and be heard on objections, and most importantly, the duty of the trial judge to make an independent evaluation of the settlement to determine whether it is reasonable and fair to class members. And it's under that rubric of fairness that the trial judge assesses whether the consideration that the class is getting is worth the consideration that the class is giving up. And, of course, in a class action, essentially the only consideration the class has to offer in settlement is the scope of the release. So it's certainly possible to imagine situations in which a trial judge could look at a settlement and conclude that the value of the released claims outweighs the value of the consideration that the class is getting and for that reason conclude that the settlement is unfair. But by the same token, there are situations, and this case is assuredly one, in which the consideration that the class is getting by way of settlement, here the guarantee of clean water, outweighs the value of the claims that are released. And just to be clear about the scope of the release, it's in appendix volume 2, docket 74-1, page 416. It covers the claims asserted in this case, which are claims by people who have no current illness. It does include claims for mental anguish to the extent that they're related to the provision of water by the West Morgan utility. However, there is an express carve-out for claims and damages related to personal injuries. So if any class member in the future develops an illness that they believe is caused by exposure to the West Morgan water, they will be free to assert a claim against DICON and seek the whole range of remedies, including for mental anguish attendant to their personal injuries. In this case, Judge Kalan was well within his discretion in approving the settlement because of the clear benefits it conferred on the class. Clean water, a refund for the one month when the do not drink the water edict was in effect. It does remedy mental anguish in the sense that it prevents mental anguish for future consumption of water. The customers have nothing to fear from the water because the level of chemicals is non-detectable. As Mr. Patterson said, the mental anguish claims here were either clearly not viable or at best entirely speculative. Under the Southern Bakeries case, mental anguish for fear of future disease, which in substance is what the plaintiffs or the objectors are seeking here, is simply not compensable as a matter of law. And finally, Judge Kalan was entitled to take into account that DICON is only a 5% contributor to the relevant chemicals in the river, yet it's paid a settlement with a value to the class of $7 million, $5 million in cash, and $2 million in other benefits. Clearly, DICON did not get off cheaply in this case, given its low responsibility for the contamination. Let me just respond to the objector's argument that somehow the Dukes case changes the landscape here. Dukes involved a litigation class. It had nothing to do with a settlement. It had nothing to do with a release. The holding was simply that monetary claims for back pay are individualized and cannot be litigated in a B-2 class. The courts expressed concerns in that case about foreclosing unasserted claims, where in the first place, DICTA, and in the second place, had to do only with the context of a litigation class in which there aren't the protections of Rule 23e, Notice, Opportunity to Object, Independent Review by the trial court. In a litigation class, once the class is certified, if it's certified as a B-2 class, class members don't get notice. They may not even know the case is going on. If the class loses, the class members may be foreclosed for unasserted claims under Res Judicata. The trial court obviously can't protect a litigation class from an adverse judgment. None of that is a concern in a settlement class where we have the protection of the trial judge assessing the fairness of the settlement and protecting the class. Thank you. Thank you, Mr. Shaughnessy. Mr. Gathings, you're going to do the rebuttal? Yes, sir. Thank you. May it please the Court, I'm Lloyd Gathings. I want to kind of get right to several points here. Number one, Judge Wilson, you said they got clean water out of this. They had clean water before the settlement was entered into it. And the suggestion that the class members are not paying for that system is totally wrong. All three of y'all have been around for a good number of years, and you've seen plaintiff's cases and how defendants do things. A defendant like Dykin, all they want to do is get out for the least amount of money they can pay and get a release against everything. They don't care who that money goes to as long as they get their release, and they don't pay any more money than they want to pay. So in this case, they're willing to pay $5 million. It's the plaintiff's lawyer that goes into that room and negotiates with them where that $5 million will go. I've had many cases that have just left it up to me, Lloyd, you know, split the $5 million up any way you want to. Just get me a release for that $5 million. That's where the conflict comes in class counsel representing their corporate defendant and representing the class members. They're not in there just batting for the class members. They're in there trying to keep their corporate client happy, and they're designating where the money goes. Let me ask you this. Yes, sir. The Owens objectors, are they just objecting to, you know, their mental anguish? They don't have their claim for damages for mental anguish anymore? Or do they actually want to go back and say, well, this $5 million is not enough? Daikon needs to cough up more money than $5 million. No, Judge, I'm not looking at the latter, how much was coughed up. I do think it was a low settlement. They just don't have 5%. We don't have apportionment of fault in Alabama. If they put anything in there, they're 100% liable for it. Well, they're objecting to the settlement. My objection was, number one, under the existing case law, I knew going in that the mental anguish should not be classed. Okay? It certainly shouldn't be classed under 23B2. That's been made very clear by this court and by the United States Supreme Court. When they did what they did, they didn't give us any recovery for mental anguish, and they didn't give us an opt-out. We made it very clear in the lower court, you give us an opt-out and we'll go away, you can have your settlement. But we wanted that procedural protection of an opt-out, and that's what the Supreme Court in Dukes has focused on. That's what this court has focused on in the case of Murray v. Auslander. That's our objection that we did not get the procedural protections that we need, and that's the thing that Dukes focused on. That's the thing that Murray v. Auslander focused on, those procedural protections. We would have gone away if they'd given us our B2, I mean our B3 opt-out. If they'd given us that procedural protection, we would have gone away. But now we can't because they didn't give that to us. They even said in their submission to the court that they would go with a B3 if he didn't do it under a B2. So a B3, if they'd done a B3, it wouldn't have put an end to the settlement. Thank you judges. Thank you counsel. And our court will be in recess until 9 o'clock tomorrow morning.